## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICIA CRONIN,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-5215** **FILED** |
| | : | |
| **VISITING NURSES ASSOCIATION** | : | SEP 2 8 2010 |
| **OF ST. LUKE'S HOSPITAL,** | : | **MICHAEL E. KUNZ, Clerk** |
| **Defendant** | : | By_____ Dep. Clerk |

## MEMORANDUM

**STENGEL, J.** September $\hat{\sigma}$ 7 , 2010

Patricia Cronin brought this action against her former employer alleging violations

of the Americans with Disabilities Act and the Pennsylvania Human Relations Act.[1]  I

granted in part the defendant's earlier motion to dismiss which narrowed to one the

remaining claims in the amended complaint, i.e., the failure of the defendant to

accommodate Miss Cronin's known disability. See Cronin v. Visiting Nurses Ass'n,

2009 U.S. Dist. LEXIS 91640 (E.D. PA September 30, 2009).

Upon termination of discovery, the defendant filed a motion for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the following

reasons, I will grant the motion in its entirety and enter judgment on behalf of the

defendant.

---

[1]  While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts. Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995). Accordingly, I shall specifically address only the ADA claim which analysis applies equally to the PHRA claim. Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

## I BACKGROUND[2]

Patricia Cronin was hired by the defendant as a Staff Based Hospice Registered Nurse on September 8, 1997. Her job responsibilities included visiting hospice patients in their homes and assessing their medical needs. Her case load ranged from as few as fifteen patients to as many as twenty-four patients at a time. Miss Cronin also served as a preceptor to train other nurses who began to work for the defendant. She regularly met with community groups to discuss the defendant's hospice philosophy. Miss Cronin wrote a book regarding hospice care with a percentage of the proceeds going to the defendant during her employment. Miss Cronin regularly worked beyond the defendant's expected hours of 8:00 a.m. to 4:30 p.m. Usually a few times a month, Miss Cronin handled emergency visits to a patient's home in the middle of the night.

In February 2007, Miss Cronin was suspended for allegedly calling in a prescription for a narcotic without a physician's order. The defendant's administrators met with Miss Cronin and informed her that they "were not sure that [she was] safe to care for patients," and that an investigation of her conduct was forthcoming. On February 12, 2007, Miss Cronin and Sharon Carney, the defendant's Director of Human Resources, met again to discuss the allegations against her.

When the investigation was completed, Miss Cronin met with the defendant's

---

[2] The majority of facts are taken from the defendant's statement of undisputed facts (Document #33-14), and the plaintiff's statement of undisputed facts (Document #36). The remaining facts are cited to the record where necessary.

2

representatives to discuss the remedial measures the defendant planned to take in response. Although the representatives explained that they discovered that the physician had given his permission for the call-in order, the investigation revealed other performance issues where Miss Cronin had not followed the processes and the procedures that were set forth through the hospice program in dealing with medications. Miss Cronin was given a Corrective Action report stating she was on third step corrective action probation for ninety days. The action plan involved her re-assignment to a registered nurse position at the in-patient "hospice house," and included a warning that she needed to "demonstrate professional behavior and practice at all times and with all patients" and that "any incidents of unprofessional behavior or inability to achieve satisfactory performance [would] result in immediate termination." At her deposition, Miss Carney testified:

> During the course of the investigation there were other performance issues that came to light. And it was a combination of, even with the narcotic, she did not follow the processes and the procedures that were set forth through the hospice program in dealing with medications. And with the other issues that came to light it was felt that it would be in her best interest to be offered the position in the hospice house, which is an in-patient facility where she could still be a hospice nurse and she could be under closer supervision.

See Carney Dep. at 26. When asked for clarification, Miss Carney indicated, "What was determined was that she could no longer work in the field independently." Id. at 27. She continued:

3

One [impropriety] was her philosophies on practicing in the realm of a hospice nurse. It was contradictive [sic] to the practices of the program. And family members were – there were complaints. And family members were becoming very upset by some of her recommendations to the point where Dr. Baxter would have to go out with a social worker to try to work with the family to bring it to some type of a resolution.

Id. at 27-28. Miss Carney continued:

As part of the corrective action and as part of the action plan that was put in place for her what we were going to do is transition her into the in-patient hospice unit where she could be under closer supervision and she could be – she could relearn the practices of hospice.

Id. at 29. When asked whether the defendant had planned to subject Miss Cronin to a

competencies and skills assessment for the new job, Miss Carney responded:

She would have [had to undergo a competencies and skills assessment] because she had been out in the field. Part of when a nurse goes from one area to another area they do go through a level of orientation and competency checking. So that would be a normal practice.

Id. at 30-31. Counsel asked Miss Carney if Miss Cronin would be considered a

probationary employee who would have had to meet certain requirements should she have

decided to take the job as a nurse at the hospice house. Miss Carney responded:

She was on probation because of the incidents that had occurred. It's always a possibility for any employee that if they transfer into another position that they have to meet the requirements of that position.

If we found that she couldn't meet the requirements of that position, we would work with her. Unless there is some real negligence involved, we would work with her to try to find

4

something that was suitable within the network that she might be successful in.

Id. at 32.

At her deposition, Miss Cronin testified that she had no intention of taking the hospice house position because it entailed working weekends, evenings, and nights, and reporting to junior nurses, some of whom she had trained. She conceded, however, that working as a hospice house nurse would be less physically demanding than working as a home-based nurse because there are more staff members at the facility to assist each other. See Cronin Dep. at 34. For the home-based nurse, there is always the potential of arriving at a patient's home alone and finding him on the floor, and there would be no one there to assist the nurse with lifting the patient back to his bed. Id. at 35. What she preferred about the home-based nurse position was its flexibility in schedule, and the fact that its clients were not as ill as those at the hospice house. Id. Miss Cronin refused the registered nurse position at the hospice house. Id. at 95.

On February 26, 2007, Miss Cronin again met with Miss Carney to view her personnel file. During the meeting, Miss Cronin excused herself and left to make a telephone call to Jonathan Munves, M.D., her primary care physician. She returned to the meeting and told Miss Carney that her physician was faxing a letter which would be relevant to their discussion. In the letter, Dr. Munves indicated that Miss Cronin suffered from multiple sclerosis, obstructive sleep apnea, depression, and a seizure disorder, and that "[t]hese conditions can all be exacerbated by night shift work and reasonable

5

accommodations should be made in light of this." Miss Cronin had never requested an accommodation for any disability during her nine-year employment with the defendant. In fact, Dr. Munves' letter was the first time the defendant was notified that Miss Cronin was claiming to have been suffering from any medical impairments.

On the following day, Miss Carney sent Miss Cronin a letter referencing Dr. Munves' letter:

> Prior to receiving this fax, [the defendant] was unaware of any of your medical conditions that would prevent you from performing the essential functions of your new position. In fact, as part of the essential functions of your previous home-based hospice nurse position you rotated call and were called out in the middle of the night on numerous occasions without any problems that we are aware of. There is no record of a request from you or any physician for an accommodation from rotating to call, especially during the night hours.

See Carney Dep. at 37-38.

Miss Cronin testified that she feared sharing her medical diagnoses with her employer for fear of termination. Several co-workers, however, were allegedly aware of Miss Cronin's medical condition including Linda Mancinelli, her immediate supervisor. Other employees who were aware of her condition included Sue Fitch-Walk, Jane Brown, and Lynn Brader. Miss Brown typically left a monthly magazine devoted to multiple sclerosis on Miss Cronin's desk. Miss Cronin also revealed her medical diagnosis of multiple sclerosis at a team meeting with other hospice nurses approximately three years before the termination of her employment.

6

Miss Carney testified that, after refusing the offered employment, Miss Cronin eventually applied for unemployment, then submitted the paperwork for Family Medical Leave Act short-term disability. Id. at 43-44. She remained on the books as an employee of the defendant for twenty-six weeks, the length of her short-term disability. Id. at 44-45. At the end of that period, Miss Carney sent Miss Cronin the paperwork for long-term disability for which Miss Cronin would have been eligible, but Miss Cronin never returned the completed paperwork. Id.

Miss Cronin testified that she had been progressively feeling worse over the last three years of her employment with the defendant. See Cronin Dep. at 39. When she was suspended in February 2007, Miss Cronin was determined "to go find out what was wrong with [her] and how [she] could feel better." Id. at 39. She sought a full evaluation with a rheumatologist who, after several new tests and the review of previous tests, determined that Miss Cronin never had multiple sclerosis, but instead suffered from central nervous system Sjogren's syndrome. Id. at 40. Miss Cronin agrees with that diagnosis because when she underwent the recommended chemotherapy and drug treatment, she began to feel better.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a

8

verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

In the remaining claim of the amended complaint, Miss Cronin asserts that she could have performed the essential functions of her job with a reasonable accommodation, but the defendant refused to provide her with such an accommodation. The defendant argues that it is entitled to summary judgment on this claim because Miss Cronin failed to create a material issue of fact, i.e., that she could have been accommodated but for the defendant's bad faith. I agree.

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Turner v. The Hershey Company, 440 F.3d 604, 607-608 (3d Cir. 2006) (quoting 42 U.S.C. § 12112(a)). The Act defines a "qualified individual with a disability" as "an

9

individual with a disability[3] who, with or without reasonable accommodation, can perform the essential functions of the employment position that individual holds or desires." Id. (quoting 42 U.S.C. § 12111(8)). An employer discriminates against a qualified individual when it does "not make reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." Id. (quoting 42 U.S.C. § 12112(b)(5)(A)). "Reasonable accommodation" means measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." Id. (quoting 42 U.S.C. § 12111(9)). The term "reasonable accommodation" further includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith. Colwell v. Rite Aid, et al., 602 F.3d 495, 504 (3d Cir. 2010). (quoting Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004)). An employee must make clear to her employer that she wants assistance for her disability.

---

[3] A "disability" is defined as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Federal Regulations define a "physical or mental impairment" as either: (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h).

Colwell v. Rite Aid, et al., 602 F.3d at 506. Although an employee's request does not have to be in writing, be made by the employee herself, or formally invoke the words "reasonable accommodation," the employer must know of both the disability and the employee's desire for accommodation. Taylor v. Phoenixville School District, 184 F.3d 296, 306 (3d Cir. 1999).

Accordingly, in order to establish a *prima facie* case of disability employment discrimination, a plaintiff must demonstrate the existence of the following elements: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she suffered an adverse employment decision as a result of the discrimination. Colwell v. Rite Aid, et al., 602 F.3d at 504. Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities. Id.

Here, Miss Cronin alleges that she is disabled, that she could have performed the essential functions of her job with a reasonable accommodation which would not have constituted a significant hardship to the defendant, but that the defendant refused to grant her one. See Am. Compl. ¶¶ 53-57. In deciding the merits of this claim, it is necessary to explore the two separate time periods of Miss Cronin's employment with the defendant, i.e., before February 26, 2007 when the defendant received Dr. Munves' letter, and after it received the letter.

11

## A. Before February 26, 2007

Miss Cronin has not established that she was disabled under the ADA before February 26, 2007. It is undisputed that her major complaint while she worked as a home-based nurse was fatigue. See Cronin Dep. at 44. Her self-styled yet successful accommodation was reclining her car seat, closing her eyes, and taking a fifteen to twenty minute break each day. Id. She regarded her symptoms as "minor." At her deposition, Miss Cronin stated, "I really have to say, you know, my symptoms were – I felt that they were minor, and I accommodated for them myself. And I think that my accommodations were minor also." Id. at 85.

There is also no medical evidence in the record to support Miss Cronin's allegations of disability, especially based on the incorrect diagnosis of multiple sclerosis. The record contains no indication of what symptoms would be typical for those who suffer from central nervous system Sjogren's syndrome, and what effect those symptoms might have had in combination with Miss Cronin's other impairments.

There is unrefuted testimony to establish that the defendant was unaware of any of Miss Cronin's health impairments until it received Dr. Munves' letter of February 26, 2007. Miss Carney testified that Miss Cronin had never told her about any health problems. See Carney Dep. at 8. Miss Cronin's personnel file contained no indication of her medical condition. Although Miss Cronin testified that she had informed some co-workers of the incorrect diagnosis of multiple sclerosis, she also testified that she was

12

unaware whether those co-workers had in turn informed their superiors. See Cronin Dep. at 74, 85. Consequently, it cannot be inferred that the defendant had even constructive knowledge of Miss Cronin's medical impairments.

What is evident is that, aside from the defendant's findings of performance issues which resulted in her re-assignment to the hospice house, Miss Cronin was able to work as a home-based registered nurse for the defendant for over nine years notwithstanding her condition just by taking a short break to deal with her fatigue. She testified that she never requested an accommodation from the defendant because she built an accommodation into her day. See Cronin Dep. at 44. It is thus apparent that, before February 26, 2007, Miss Cronin was able to perform the essential functions of her job with a reasonable, though self-imposed, accommodation. Miss Cronin has not established that during the relevant period she had an impairment that substantially limited a major life activity, that she had a record of such impairment, or even that the defendant regarded her as having such an impairment. Accordingly, I find that Miss Cronin has not established a *prima facie* case for employment discrimination based on disability during the period beginning with her date of hire with the defendant and ending on February 26, 2007, when the defendant was first notified of Miss Cronin's medical impairments and her request for a reasonable accommodation.

## B. After February 26, 2007

Whether Miss Cronin was a disabled person within the meaning of the ADA

13

beginning on February 26, 2007 is tenuous at best. Dr. Munves' brief letter indicates only that Miss Cronin is a patient of his "who has Multiple Sclerosis, Obstructive Sleep Apnea, Depression and a Seizure Disorder. These conditions can all be exacerbated by night shift work and reasonable accommodations should be made in light of this." See Document #33-6. The Essential Physical Requirements - Registered Nurse form depicts only an individual with various physical limitations. See infra pp. 16-18. I am not fully persuaded that Miss Cronin has established that she was disabled. Nevertheless, for the purposes of this motion and because it is not dispositive here, I will assume that Miss Cronin has established that she was disabled under the ADA after February 26, 2007, and that she has therefore satisfied the first element of the *prima facie* case for employment discrimination.

The second element of the *prima facie* case is satisfied by meeting a two part test. First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." See 29 C.F.R. pt. 1630, App. § 1630.2(m) at 383.

Despite some suggestion in the record that the defendant questioned her judgment and ability to continue to work independently, Miss Cronin is a licensed registered nurse with "certifications in hospice and palliative care and a certification in oncology." See Cronin Dep. at 8. The defendant did not terminate Miss Cronin's employment or find that she was unqualified to practice nursing. Rather, it sought to place her in the hospice

14

house where she could be under closer supervision and relearn the practices of hospice following an investigation. Accordingly, I find that Miss Cronin possessed the prerequisites for a nursing position with the defendant.

Second, a court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." See 29 C.F.R. pt. 1630, App. § 1630.2(m) at 383. Miss Cronin alleges that she could have performed the essential functions of her position with a reasonable accommodation, but the defendant failed to accommodate her.

To show that an employer has violated its duty to engage in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Taylor v. Phoenixville School District, 184 F.3d at 319-320; see also Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 330 (3d Cir. 2003) (the interactive process must include sufficient notice to inform the employer that an employee is requesting an accommodation followed by good faith participation of the employer and employee in that interactive process).

Through the receipt of Dr. Munves' letter dated February 26, 2007, the defendant became aware both of Miss Cronin's medical impairments and her request for reasonable

15

accommodations. After receiving the request for unspecified accommodations in Dr.

Munves' letter and in an effort to initiate the interactive process, the defendant attempted

to explore with Miss Cronin her alleged limitations. It requested that she complete a form

entitled "Essential Physical Requirements – Registered Nurse." Miss Carney testified that

the form was sent to Miss Cronin for further clarification from her physician as to exactly

for what accommodation he was asking. See Carney Dep. at 39. This procedure is in

accordance with the relevant ADA's regulations which provide the following guidance:

> To determine the appropriate reasonable accommodation it
> may be necessary for the employer to initiate an informal,
> interactive process with the employee in need of
> accommodation. This process should identify the precise
> limitations resulting from the disability and the potential
> reasonable accommodations that could overcome those
> limitations.

29 C.F.R. pt. 1630.2(o)(3). Similarly, the EEOC's interpretive guidelines provide that:

> Once a qualified individual with a disability has requested
> provision of a reasonable accommodation, the employer must
> make a reasonable effort to determine the appropriate
> accommodation. The appropriate reasonable accommodation
> is best determined through a flexible, interactive process that
> involves both the employer and the employee with a
> disability.

29 C.F.R. pt. 1630, App. § 1630.9 at 383; see also Mengine v. Runyon, 114 F.3d 415,

419-420 (3d Cir. 1997) (both parties have a duty to assist in the search for appropriate

reasonable accommodation and to act in good faith).

In response to the defendant's request for more information, Miss Cronin

16

collaborated with Dr. Munves in completing the form, and estimated that she was not able to: (1) stand longer than thirty minutes; (2) lift or carry more than twenty-five pounds; (3) push or pull more than fifty pounds; and (4) stoop/bend, squat, crouch, kneel or crawl frequently. In fact, she indicated that her maximum weight for lifting and repositioning patients was fifty pounds unassisted and one hundred pounds assisted. Miss Cronin further admitted that she: (1) needed assistance to get from kneeling, squatting, or crouching to a standing position; (2) was unable to pull patients up from falls or transfer patients between bed and chair unless the patient was able to bear his or her own weight; (3) had fallen several times due to leg weakness and fatigue, and as a result, was treated by the defendant's Employee Health department for a sprained ankle, facial abrasions, and a sprained wrist; and (4) received injuries as a result of a few falls during work hours for which she did not seek treatment.

At various sections on the form, an identical question was posed: "What is the anticipated date that the employee will be able to return to full capacity required for this position?" The identical answer was provided for each section, "chronic[4] condition." Neither Miss Cronin nor Dr. Munves suggested any accommodations on the Essential Physical Requirements – Registered Nurse form. When asked whether she had

---

[4] "Chronic" is defined in Dorland's Medical Dictionary as "persisting for a long time; applied to a morbid state, designating one showing little change or extremely slow progression over a long period." This response suggests that Miss Cronin and her physician believed it was unlikely that she would ever return to the full capacity required.

17

determined after reading these limitations whether Miss Cronin would be able to meet the essential physical requirements of her job, Miss Carney responded, "It was determined by her doctor that these are the requirements that she could meet."

Upon receipt and review of the form, Miss Carney sent Miss Cronin a letter dated March 14, 2007, which stated, "After reviewing the restrictions documented by your physician, you agree that you would be unable to fulfill the essential functions of the position available to you at the hospice house." Id. at 108. The letter continued,

> "As discussed, I am willing to work with you and other
> network entities to find a position that would allow you to
> perform the essential functions of that position. You agreed
> to review the open to be filled positions on the network
> applicant tracking system. You also stated that you would
> communicate with me by Friday, March 16th, as to any
> position you may want to explore or to the future status of
> your employment."

See Carney Dep. at 42.

Miss Carney's letter reflects an understanding of the importance of both parties bearing responsibility during this interactive process often stressed by the Third Circuit Court of Appeals:

> An employee's request for reasonable accommodation
> requires a great deal of communication between the employee
> and employer. Both parties bear responsibility for
> determining what accommodation is necessary. Neither party
> should be able to cause a breakdown in the process for the
> purpose of either avoiding or inflicting liability. Rather,
> courts should look for signs of failure to participate in good
> faith or failure by one of the parties to help the other party
> determine what specific accommodations are necessary. A

18

> party that obstructs or delays the interactive process is not
> acting in good faith. A party that fails to communicate, by
> way of initiation or response, may also be acting in bad faith.
> In essence, courts should attempt to isolate the cause of the
> breakdown and then assign responsibility.

Taylor v. Phoenixville Sch. Dist., 184 F.3d at 312 (quoting Bultemeyer v. Fort Wayne

Community Schools, 100 F.3d 1281 (7th Cir. 1996)); see also Conneen v. MBNA

America Bank, N.A., 334 F.3d at 329-330 (citing 29 C.F.R. pt. 1630.2 and 29 C.F.R. pt.

1630, App. § 1630.9) (although not in the text of the ADA itself, applicable regulations

call for an interactive process between the employer and employee to determine

appropriate reasonable accommodation).

Nevertheless, Miss Cronin stopped the interactive process with the defendant, and

did not continue the good faith dialogue contemplated by the ADA. When asked if the

defendant had assisted her in attempting to find a position in the network which was

consistent with her restrictions or limitations, Miss Cronin responded, "No, I don't think

they assisted me. But I don't – I didn't ask for assistance either." See Cronin Dep. at

112. Upon further questioning, Miss Cronin clarified, "They offered [to assist me or

interact with me in an attempt to find me another position]. You know, we'll help you,

you know, if you need help, we'll help you, I knew how to use the site. . . Yeah, they

offered to assist me, I didn't need their assistance." Id. at 113. When asked if a position

in the hospice house would not have fulfilled her desire to continue to work in hospice,

Miss Cronin responded, "That was not the job for me. . . that would have been

detrimental to my health. Absolutely that was a setup, in my opinion." Id. at 114.

Miss Carney sent another letter to Miss Cronin dated March 19, 2007, which

indicated:

> "Your physician has verified that you are unable to perform
> the essential functions of either your current or former nursing
> position with [the defendant]. Our interactive process yielded
> no reasonable accommodation that would allow you to
> perform those essential functions. . . . I expressed a
> willingness to assist you to find another position within St.
> Luke's. You reviewed the available positions and informed
> me that you found none to be suitable. You have two options
> at this point. You may resign from employment and apply for
> unemployment benefits, or you may request a leave of
> absence."

See Carney Dep. at 42-43. Miss Cronin testified that she agreed with these statements

written by Miss Carney that she would be unable to work at any position with the

defendant due to her medical condition. See Cronin Dep. at 129.

In fact, on April 15, 2007, Miss Cronin completed a short-term disability form

where she indicated that she was only capable of sedentary clerical or administrative

work. Id. at 61. At her deposition, Miss Cronin conceded that the position of either a

home-based hospice nurse or an in-house hospice nurse was not consistent with sedentary

clerical or administrative work. Id. at 61. Miss Cronin also testified that her physical

limitations would not permit her to pull patients up from falls. Id. at 70. She further

clarified that she would never have been able to do that during the course of her

employment with the defendant. Id. at 70.

20

The defendant cannot be faulted under these circumstances. It opened the dialogue with Miss Cronin immediately upon receipt of Dr. Munves' letter in an effort to secure the information necessary to assist in the interactive process. Following review of that information, it became clear to both parties that Miss Cronin would not be able to perform the essential functions of the previously-offered job of registered nurse at the hospice house. I note that employers are not required to modify the essential functions of a job in order to accommodate an employee. Donahue v. Conrail, 224 F.3d 226, 232 (3d Cir. 2000) (decided under the Rehabilitation Act, which uses the same standard as the ADA). The defendant offered, however, to work with Miss Cronin to explore other possible avenues of employment and to find a reasonable accommodation. While Miss Cronin supplied the requested information, she refused further help in finding a job and ultimately decided that she would be unable to work at any current position with the defendant. The ADA does not require an employer to create a new position to accommodate an employee with a disability. Buskirk v. Apollo Metals, 307 F.3d 160, 169 (3d Cir. 2002). Here, there is no dispute that Miss Cronin was unable to perform the essential functions of a registered nurse with the defendant, and the defendant had no duty to change the requirements for those positions to accommodate Miss Cronin's physical capacity.

In conclusion, Miss Cronin has failed to satisfy the requirements of a *prima facie* case of employment discrimination based on disability. She has further failed to meet her

*Celotex* burden of making a factual showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322. Accordingly, I will grant the defendant's motion and enter judgment in its favor.

An appropriate Order follows.